UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | CRIM. NO. 07-318 (EGS) |
| ) | |
| TERRY HALL, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER DETENTION

The United States of America (the "Government"), through its attorney, William M. Welch II, Chief, Public Integrity Section, Criminal Division, U.S. Department of Justice, respectfully submits this memorandum in opposition to the motion of the defendant Terry Hall ("Hall") to reconsider the Court's order of detention. As explained below, because the Court's determination that Hall is a serious risk of flight whose presence no condition or combination of conditions could reasonably assure is fully supported by the law and the evidence, Hall's motion should be denied.

### Background

On November 15, 2007, federal law enforcement agents, acting on a warrant issued by a U.S. Magistrate Judge in this District, arrested Hall in a suburb of Atlanta, Georgia. The warrant was issued on the basis of a criminal complaint charging Hall with violating 18 U.S.C. § 201(a). On November 20, 2007, Hall was indicted for violating 18

U.S.C. § 201(b)(1)(A)[1] in connection with payments offered and made to a U.S. military contracting officer at Camp Arifjan, Kuwait, in connection with millions of dollars worth of contracts for the purchase of bottled water from companies controlled by Hall. Later the same day, a U.S. Magistrate Judge in the Northern District of Georgia ordered that Hall be released on the basis of several conditions, including a $100,000 surety bond to be posted by one of Hall's corporations, home confinement, and electronic monitoring.[2]

On November 21, 2007, the Government filed a motion in this Court to stay and to revoke the release order issued by the federal magistrate judge in Georgia. The Government argued that Hall was a serious risk of flight because he: (1) had extensive contacts overseas, including in Kuwait, a country with whom the U.S. does not have an extradition treaty; (2) had ample financial means with which to support himself overseas indefinitely; (3) had weak ties to the U.S.; and (4) was demonstrably untrustworthy, as evidenced by the fact that he had destroyed evidence and made misleading statements to and withheld material information from Pretrial Services and the Court about his assets and financial activities.

---

[1] In pertinent part, section 201(b)(1)(A) makes it a crime to "corruptly give[], offer[], a promise[] anything of value to public official ... with intent to influence any official act ..."

[2] In Atlanta, Hall completed a financial affidavit in connection with his Pretrial Services interview, in which he stated that his net worth was $406,417. Specifically, he represented that: he had a total of $8,000 in bank accounts; a residence worth $165,000; real estate worth $250,000; three automobiles worth a total of $104,000; and unpaid mortgages of $135,000. Hall left blank the entry for business net worth, and did not sign the affidavit.

Hall informed pretrial services in Atlanta that he owned two companies: U.S. Eagles Logistics LLC, which develops real estate properties, and Freedom Consulting & Catering Co., a U.S. military contractor from which he received income of $22,000 per month.

To support its argument, the Government submitted sworn statements from two law enforcement officers. The affidavits summarized evidence -- including records seized from Hall's own laptop computer -- that Hall, using bank accounts he controlled in Kuwait and United States, had paid bribes of over $2 million to four Army contracting officers in connection with approximately $20 million in Army contracts. See Affidavit of Special Agent Eleanor Rathbone dated November 16, 2007 ("Rathbone Aff."); Affidavit of Special Agent Kevin Donnelly dated November 16, 2007 ("Donnelly Aff."). Among other things, the affidavits detailed evidence that Hall: used intermediaries and shell companies to funnel the bribe money to the contracting officers and their family members via bank accounts in Kuwait, the Philippines, the United Arab Emirates, the Cayman Islands, and Curacao; prepared bogus consulting agreements to create the appearance that the bribes were legitimate payments; and communicated in code with his co-conspirators. Rathbone Aff. at ¶¶ 7-11; Donnelly Aff. at ¶¶ 14-19, 23-30.

Regarding Hall's financial means, the Government represented that, as of August 31, 2007, Hall had balances of over $500,000 in bank accounts that he controlled or had access to in the U.S., Kuwait, the United Arab Emirates, the Channel Islands, and Djibouti. The Government also represented that Hall owned real estate in Georgia and Alabama worth over $2.8 million.

On December 7, 2007, after hearing oral argument from the parties, this Court revoked the order releasing Hall on bond. Stating that it had reviewed the matter de novo, the court found that Hall: (1) had very substantial means and the ability to support himself abroad; (2) was a significant risk of flight to Kuwait, a country with whom the U.S. has no extradition treaty; and (3) had no ties whatsoever to the District of Columbia

and insubstantial ties to other districts in the United States. Transcript of December 7, 2007 conference at 27-28.

On December 13, 2007, Hall filed a motion for release. Among other things, Hall argued that he had long-standing family and property ties to the State of Georgia, that his presence in the Middle East over the past five years was incidental to his business activities, and that he had permanently relocated to Georgia and severed his overseas business ties. Hall also argued that had he intended to flee, he would have done so after learning that he was a subject of the Government's investigation. Hall asserted that the Government had failed to adduce any evidence that Hall intended to flee or had taken any preparatory steps.

In its opposition to Hall's motion, the Government pointed out that, after learning in spring 2007 that he was a subject of the Government's investigation, Hall did not sever his overseas ties. Instead, as his passport indicated, during the period May to July 2007, Hall made trips to Kuwait, the United Arab Emirates, and the Philippines – all countries through which he had transferred bribe money and the proceeds of his other illegal activities. Additionally, the Government represented that bank records showed that, during the same period, Hall had received hundreds of thousands of dollars of wire transfers from various offshore accounts, including accounts in the Cayman Islands and Djibouti.

As for Hall's purportedly close family members, the Government observed that Hall had informed Pretrial Services that he maintained a relationship with only one of those persons (his sister Andrea) who, when contacted by law enforcement, stated that she did not know where he brother resided.

4

On December 18, 2007, the Court heard oral argument on the defendant's motion for release. Hall's counsel conceded that Hall had lived in Kuwait for five of the past six years and had bank accounts there; that he had accumulated significant wealth; that he had an interest in real estate in Alabama "with another person"[3]; that the financial affidavit he submitted to Pretrial Services in Atlanta "may not have been correct"; and that Hall had travelled abroad as recently as three months before his arrest. Transcript of December 18, 2007 conference ("12/18/07 conf. tr.") at 8, 10, 13, 28. Nonetheless, Hall contended that the Government had failed to demonstrate that he was a flight risk, reiterating the arguments he had made in his written submissions.

The Court upheld its previous conclusion that Hall was an unreasonable flight risk, for substantially the reasons the Government had articulated. Regarding Hall's argument that, had he intended to flee he would have done so after learning he was an investigative target, the Court pointed out that since his indictment, Hall is facing significant jail time that he was not confronted with previously. 12/18/07 conf. tr. at 5. The Court stated that Hall had significant overseas ties, and that Hall did not dispute that he had significant personal wealth. Id. at 6. As for Hall's claim that he had relocated to the U.S., the Court found that Hall had not severed his international ties. Id. at 27. Regarding Hall's claim that he was a doting father, the Court stated that the e-mail messages it had reviewed belied that assertion. Id. at 31, 34-35. Concerning the serious risk that Hall might flee to Kuwait, the Court stated that it was quite difficult to induce

---

[3] The "other person" with whom Hall owns real estate in Alabama is Eddie Pressley, an Army contracting officer who served at Camp Arifjan in 2004 and 2005 and handled contracts with one of Hall's companies worth approximately $8.8 million. According to the Government's factual submission, Hall paid Pressley's wife over $1.5 million using bank accounts he controlled in Kuwait and the U.S. Donnelly Aff. at ¶ 23.

countries with which the U.S. has extradition treaties to return fugitives, let alone countries with which we do not have such treaties. Id. at 38-40. With respect to the suggestion that the flight risk could be controlled by means of GPS monitoring, the Court stated that an individual intent upon fleeing could frustrate such monitoring. Id. at 42.

The Court stated that it was obligated to consider the Government's evidence of the international wire transfers, the significant international travel, and Hall's illegal activity. Id. at 28, 47. The Court observed that it was undisputed that Hall had significant and demonstrated personal and business ties to other countries, including the countries identified in the Government's affidavits. Id. at 47. The Court pointed out that it was also undisputed that Hall had spent five of the past six years in Kuwait, a country with whom the US had no extradition treaty, but added that it was concerned Hall might flee to other countries as well. Id.

The Court stated that Hall had, by his own admission, significant financial assets, which gave him the means to leave the U.S. Id. According to the Court, those assets, combined with Hall's ties to individuals in other countries, made him a serious risk of flight. Id. at 48. The Court added that the fact the Government was in possession of Hall's passport was not important, because a person with means could travel without a passport. Id. at 48-49.

At a February 1, 2008 conference, the Court asked the parties to submit legal authorities on the question whether risk of flight alone may support pre-trial detention. In its memorandum of law, the Government argued that, under 18 U.S.C. § 3142, risk of flight alone is an adequate and independent basis for pre-trial detention without regard to any danger the defendant may pose to the community. The Government cited well-

settled authority that, for pretrial detention to be imposed, lack of reasonable assurance of either appearance or safety of others or community is sufficient; both are not required. The Government also pointed to numerous cases, including cases in this Circuit, in which defendants have been detained prior to trial on the basis of a judicial finding of risk of flight, irrespective of whether they pose a danger to the community. Hall does not dispute this proposition.

In his motion for reconsideration, Hall argues that the evidence supporting the Court's risk of flight finding -- which he claims consists solely of opportunity to flee and means to survive abroad -- is legally inadequate. According to Hall, the law requires the Government to prove that Hall expressly stated that he intended to flee, was making preparations to flee, or had the propensity to flee. Motion to Reconsider Defendant's Detention (Defendant's Motion to Reconsider") at 5. As for the evidence the Government previously presented of Hall's financial means, Hall contends that the evidence was "dated and inaccurate." Id. at 6. Hall argues further that, since his arrest, his financial condition was worsened significantly, in that two pieces of property he owns in the U.S. are in foreclosure. Id. Next, Hall contends that the Government, in its showing that he had contacts overseas to whom he could turn for assistance as a fugitive, failed to identify any particular individuals. Id. at 6-7. Concerning his ties to the community, Hall produces letters from his sister, cousin, and a family friend attesting that he is responsible and trustworthy. Finally, regarding the fact that, should he flee to Kuwait, the U.S. could not extradite him, Hall counters that Kuwait and the U.S. enjoy close relations. Id. at 7.

Argument

Hall's motion lacks merit. Contrary to his assertion, in order to detain a defendant as a risk of flight, the Court need not find that the defendant expressly stated his intent to flee or was preparing to do so. Hall mischaracterizes the record by suggesting that the sole basis for the Court's finding that Hall was a serious flight risk whose presence no condition or combination of conditions could reasonably assure, was opportunity and means.

Moreover, the Court's finding is supported by ample evidence. The Government's prior evidentiary showing of Hall's financial wealth was neither inaccurate nor outdated, and is supplemented by more recent evidence of a conversation between Hall and his sister about secret funds. Particularly in light of valuable real estate Hall owns that the Government recently discovered, Hall's claims of poverty are unconvincing, and his failure to disclose this information renders his claims untrustworthy. Finally, the individuals Hall offers to support his assertion that he is a suitable candidate for release lack the ability to exercise moral suasion over him.

A.  <u>Hall Misstates the Law Concerning Pretrial Detention</u>

The Court should make quick work of Hall's contention that, in order to detain a defendant pretrial on grounds of risk of flight, a court must find that the defendant expressly stated that he intended to flee, was making preparations to flee, or had the propensity to flee. Hall cites no legal authority for this dubious proposition. There is nothing in the statute, 18 U.S.C. § 3142, which suggests the existence of such an onerous requirement. Instead, the statute provides that, where the Government contends that the defendant is a serious flight risk, the Court should, following a hearing, determine if the defendant is in fact a serious flight risk and if so, whether any condition or combination

of conditions will reasonably assure the defendant's appearance as required. 18 U.S.C. § 3142(e), (f). The statute further provides that, in making this determination, the Court should consider the nature and circumstances of the offense charged, the weight of the evidence against the defendant, and the defendant's history and characteristics. 18 U.S.C. § 3142(g). The court's findings must be supported by a preponderance of the evidence. See United States v. Xulam, 84 F.2d 441, 442 (D.C. Cir. 1996).

Thus courts routinely base risk of flight findings upon just the type of evidence presented here – that the defendant is charged with a serious offense, that he is facing a substantial prison sentence, that the Government's evidence is strong, that the defendant's ties to the community are weak, that he has contacts overseas, and that he has the financial means and ability to flee. See, e.g., United States v. Motta-Vargas, 2007 WL 1232187 (D.D.C. 2007) (defendant posed a risk of flight because of his "strong incentives to flee" and "his lack of any connection to the community"); United States v. Simpkins, 826 F.2d 94, 97 (D.D.C. 1987) (no combination of conditions could reasonable assure the defendant's appearance in view of the strength of the government's evidence and the seriousness of the charges); United States v. Epstein, 155 F. Supp 2d 323, 325-26 (E.D.Pa. 2001) (defendant detained as risk of flight; "crucial factor" was "defendant's lack of ties to the United States and his extensive ties to Brazil with which no extradition treaty exists"); United States v. Townsend, 897 F.2d 989, 994 (9th Cir. 1990) (nature and circumstances of charged offenses weighed against bail where defendant accused "of sophisticated criminal conduct, whose successful completion required the ability to travel internationally, to adapt easily to foreign countries, and to move assets and individuals

quickly from one country to another" (cited approvingly in United States v. Anderson, 384 F. Supp 2d 32, 36 (D.D.C. 2005)).

To support his legal challenge to the Court's detention order, Hall points out that "mere opportunity for flight is not is not sufficient grounds for pretrial detention." Defendant's Motion to Reconsider at 5 (citing United Sates v. Himler, 797 F.2d 156 (3d Cir. 1986) and Xulam, supra, 84 F.3d 441). The Government has never argued, and the Court did not find, otherwise. Indeed, as the Court has stated several times, Hall is a serious risk of flight not because if released he would have the opportunity to flee, but because: (1) ) Hall has very substantial means and the ability to support himself abroad; (2) Hall has significant and continuing ties to foreign countries, including Kuwait, with whom the U.S. has no extradition treaty; (3) Hall has no ties whatsoever to the District of Columbia and insubstantial ties to other districts in the United States; (4) Hall is facing significant jail time; and (5) the Government has presented convincing evidence of Hall's international wire transfers, significant international travel, participation in illegal activities. These facts clearly distinguish this case from Himler (finding that specified bail conditions would reasonably assure defendant's appearance; defendant had proven record of appearing previously when released on bail, had close family ties in the area, and his father was willing to post money, act as son's custodian, and report to the court any violations of release conditions), and Xulam (finding that defendant, a human rights advocate, was not a flight risk because he had strong community ties, respected members of the community were willing to supervise his release, and his lifestyle strongly suggested that he would remain in U.S.).

    B.    <u>The Court's Risk of Flight Finding Is Supported by Sufficient Evidence</u>

1.  Hall's Money and Property

Contrary to Hall's assertion, the Government's prior evidentiary showing that Hall had substantial assets to enable him to flee and survive abroad was neither inaccurate nor outdated. Hall himself has previously conceded that he is a person of substantial means. In the financial affidavit he submitted to Pretrial Services in Atlanta, Hall reported that his net worth was $406,417, which included real estate worth $250,000, a residence worth $165,000, three automobiles worth a total of $104,000, and $8,000 in bank accounts. Hall also reported that he owned two companies, which engaged in real estate development and military contracting, respectively, the latter of which paid him a salary of $22,000 per month. At the December 18, 2007 conference, Hall's counsel conceded that, as a result of his overseas activities, Hall had accumulated significant wealth; in making its risk of flight finding, the Court stated that this fact was undisputed. 12/18/07 conf. tr. at 6, 8.

The Government submitted independent evidence of Hall's wealth, by way of affidavit and proffer, which bolstered these admissions. (See, e.g., Government's Memorandum in Opposition to Defendant's Motion for Release dated December 18, 2007 at 3-4). Much of this wealth was overseas and, insofar as it constituted criminal proceeds, it was sometimes held not in Hall's name but in the name of companies or confederates whom Hall could control, including Finbar Charles, Eddie Pressley, Eurica Pressley, and Kermit Cruz. Hall freely moved large sums of money through these bank accounts in Kuwait, the United Arab Emirates, the Philippines, the Cayman Islands, Curacao, Djibouti and the U.S., as the following selected transactions indicate:

| Date | Event | Source |
|---|---|---|
| 9/30/06 | Eddie Pressley informs Hall that he opened an | e-mail message from |

11

| | | |
|---|---|---|
| | account at Regions Bank, # 0400930237, will send Hall the signature card for the account, and that they need to have some assets in the account to get the loan. Pressley states that he is putting 55k in the account asks Hall to deposit 100k "to get the green light for this loan so we can start building" | pressleye@aol.com to terryhall2003@yahoo.com |
| 10/13/06 | An unidentified individual wires $109,970 from a Hall-controlled account at the National Bank of Kuwait ("NBK") to U.S. Eagles Logistics' account at Regions Bank (the "Eagles account") | NBK telex transfer application; Regions Bank statement dated 10/31/06 and wire transfer record |
| 12/1/06 | An unidentified individual wires a total of $999,940 from a Hall-controlled account at NBK to the Eagles account, bringing the account balance to $1,097,189.34 | NBK telex transfer application; Regions Bank statement dated 12/29/06 and wire transfer records |
| 12/21/06 | Law enforcement agents search the Texas residence of Hall confederate John Cockerham | |
| 12/28/06 | Hall directs Finbar Charles to "do three invoices from BBI to US Eagles Logistic Services for the 1.2 millions to be transferred back to the account at 500K each and 250k so we can send it to them asap." Charles does so later that day. | e-mail message from terryhall2003@yahoo.com to Bluebridge International; e-mail message from finbar@bluebridgeintl.com to freedom consulting |
| 12/28/06 | Hall forwards the invoices to Eddie Pressley | e-mail message from freedom consulting to pressleye@aol.com |
| 1/10/07 | An unidentified individual wires $400,000 from the Eagles account to a Hall-controlled account at NBK, bringing the balance to $641,213.40 | Regions Bank statement dated 1/31/07 and wire transfer reports |
| 1/18/07 | An unidentified individual wires $600,000 from the Eagles account to a Hall-controlled account at NBK, bringing the balance to $40,014.42 | Regions Bank statement dated 4/30/07 and wire transfer reports |
| 3/13/07 | An unidentified individual wires $19,970 from a Hall-controlled account at NBK to the Eagles account, bringing the balance to $31,275.96 | Regions Bank wire transfer report |
| 4/19/07 | Eurica Pressley wires $25,000 from her Cayman National Bank account to the Eagles account, bringing the balance to $34,304.64 | Regions Bank statement dated 1/31/07 and wire transfer reports |
| 4/24/07 | An unidentified individual wires $25,000 from a Hall-controlled account at NBK to Terry and Marquita Hall's Bank of America ("BoA") account | BoA statement |
| 5/16/07 | An unidentified individual wires $40,000 from a Hall-controlled account at NBK to Terry and Marquita Hall's BoA account | BoA statement |
| 6/6/07 | As of this date, there is $509,437.77 in Eurica Pressley's time deposit account at Cayman National Bank. Bank records indicate that, on 6/4/08, the account will have a maturity value of $533,702.36. | Cayman National Bank confirmation notice |

12

| 7/6/07 | An unidentified individual wires $31,975 from a Hall-controlled account at a bank in Djibouti to the Eagles account | Regions Bank statement dated 7/12/07 |
|---|---|---|
| 7/27/07 | Eurica Pressley wires $100,000 from her Cayman National Bank to the Eagles account, bringing the balance to $105,087.46 | Regions Bank statement dated 7/31/07 and Regions Bank and Citibank wire transfer reports |
| 8/7/07 | Eddie Pressley writes a $100,000 check on the Eagles account, leaving a balance of $5,087.46 | Regions Bank statement |
| 9/24/07 | Eurica Pressley wires $40,000 from her Cayman National Bank account to the Eagles account, bringing the balance to $45,075.46 | Regions Bank statement dated 9/28/07 and wire transfer record |
| 10/1/07 | Eurica Pressley wires $77,890.08 from her Cayman National Bank account to the Eagles account, bringing the balance to $120,824.54 | Regions Bank statement and wire transfer report; Cayman National Bank statement |

As these transactions illustrate, far from cutting his ties overseas and confining himself to purely local affairs, as hall contends he did in spring 2007, Hall continued to access offshore accounts and move significant sums of money internationally well into the fall, shortly before his arrest. The fact that certain of these accounts were depleted at a single point in time, as Hall asserts, is irrelevant. The account balances would rise and fall as Hall and his co-conspirators needed to use the funds. Moreover, because Hall stored funds in offshore jurisdictions from which it is difficult to obtain legal assistance,[4] the Government's records are necessarily incomplete and substantial parts of Hall's illegal gains remain unaccounted for. During the course of his criminal scheme, Hall obtained "seed money" from several Middle Eastern investors, and he entrusted large amounts of proceeds to his co-conspirators Finbar Charles, Eddie Pressley, Eurica

---

[4] Hall's assertion that he is not a risk of flight to Kuwait because the U.S. enjoys good relations with that country, notwithstanding the absence of an extradition treaty, is misplaced. The Court specifically found that Hall was a risk of flight not just to Kuwait but to other countries as well. Moreover, as the Court noted at the December 18, 2007 conference, if it is a challenge to convince a country with which the U.S. has an extradition treaty to return a fugitive, it would be even more difficult to retrieve Hall from a country with whom we do not.

Pressley, and Kermit Cruz.[5] None of these persons has been charged, and each of them has the means and incentive to assist Hall should he become a fugitive.

Hall suggests that, during his incarceration, his financial condition has deteriorated to the point that he lacks the means to flee. The picture of poverty he paints is misleading. As recently as four months ago, Hall and his sister Andrea were discussing secret funds. In a March 2008 telephone conversation that was recorded by prison authorities, Andrea Hall informed Terry Hall that their cousin Ron Hall was in possession of "that card," and had gotten a certain amount "off of it." She then asked Terry Hall if he wanted Ron Hall to use the card again. Terry Hall responded, "don't talk to me about that ... I told you what to do already. You should know."

In an effort to bolster his claim of indigence, Hall mentions two properties that are in foreclosure. Yet he neglects to mention a 16.5 acre parcel of land that he owns in Fayette County, Georgia which he purchased in July 2005 for $189,000. Georgia real estate records indicate that this property is presently unencumbered. Even through this filing, Hall persists in his efforts to mislead the Court about his financial position and to conceal valuable assets from the Government.

2.  Hall's Ties to the Community

Hall's argument that his ties to Georgia make him a good candidate for release is unavailing. Hall submits letters from his sister Andrea, cousin Ron, and a family friend named Mitchell Rock in an effort to convince the Court that he is a trustworthy person who has always been there for his family. There are good reasons to discount these letters. As the Court has noted, Hall's e-mail correspondence with his ex-wife casts him

---

[5] Finbar Charles is a citizen of St. Lucia and has residences in Kuwait and the Philippines. The Pressleys and Kermit Cruz are U.S. citizens and live in this country.

in a rather different light than Hall would now have the Court believe. Additionally, it is unlikely that either Andrea Hall or Ron Hall can exercise moral suasion over Terry Hall, since it appears he has given them access to his secret funds. Nor does Mitchell Rock seem to possess any greater credibility. In a May 17, 2006 e-mail message to Rock retrieved from Terry Hall's laptop computer, Hall instructed Rock to pick up some paperwork from Hall's house and send it to the wife of an Army contracting officer. The paperwork concerned a shell company that Hall had established for the purpose of funneling bribe money to the contracting officer. This is the same contracting officer whom Hall is charged with bribing in the indictment. Significantly, none of these individuals (or any of the persons with whom Hall has done such lucrative business over the years) has offered to sign a bond or post any property on Hall's behalf.

Conclusion

For all the reasons set forth above and in the Government's previous submissions, Hall's motion to reconsider detention should be denied.

Dated: July 30, 2008

                Respectfully submitted,

                WILLIAM M. WELCH II
                Chief, Public Integrity Section
                Criminal Division
                U.S. Department of Justice

      By:     /s/
             PETER C. SPRUNG
             DEBORAH MAYER
             Trial Attorneys
             (2020 305-4042

## CERTIFICATE OF SERVICE

      I, Peter C. Sprung, Trial Attorney, U.S. Department of Justice, do hereby certify that I served a copy of the foregoing Government's Memorandum in Opposition to Defendant's Motion to Reconsider Detention upon the individual below by electronic mail and by filing said memorandum with the District of Colombia District Court's electronic document filing system:

Tony Miles, Esq.
Assistant Federal Public Defender
Office of the Federal Public Defender
625 Indiana Ave. NW, Suite 550
Washington, DC 20004

                                                                                 /s/
                                          PETER C. SPRUNG
                                          Trial Attorney
                                          Public Integrity Section