**IN THE
UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| v. | ) | CR. NO. 07-318 (EGS) |
| **TERRY HALL** | ) | |

**REPLY TO GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO RECONSIDER DEFENDANT'S DETENTION**

Terry Hall, by and through counsel, respectfully submits this reply to Government's Memorandum in Opposition to Defendant's Motion to Reconsider Detention.

**INTRODUCTION**

On July 30, 2008, the government filed an opposition to Mr. Hall's motion for reconsideration of his detention status in the instant case. Disturbingly, the government's opposition is replete with inaccurate statements, mischaracterizations of Mr. Hall's arguments, and reckless speculation. In this Reply, Mr. Hall seeks to address many of the government's inaccuracies and mischaracterizations in order to provide this Court with a more correct and reliable understanding of the facts and issues related to Mr. Hall's detention status.

**DISCUSSION**

1. <u>Issues Involving Bond in the Northern District of Georgia</u>

In its Response, the government incorrectly argues that Mr. Hall improperly concealed certain information from Pretrial Services in the Northern District of Georgia. The government's argument is premised on a misunderstanding of the process by which Mr. Hall was interviewed in Georgia, a careless interpretation of the Pretrial Services documents, and a failure to recognize Mr. Hall's understanding with regard to the information he was asked to report.

Information which appears in the "Pretrial Services Report" is based on a brief interview a Pretrial Services agent had with Mr. Hall while Mr. Hall was in custody in the federal courthouse building in the Northern District of Georgia. Since the interview was conducted with the door to Mr. Hall's cell closed, the door provided a barrier between the interviewer and Mr. Hall. The interviewer asked Mr. Hall certain questions from at least two forms, and the interviewer maintained possession of the forms when questioning Mr. Hall.[1] Rather than having Mr. Hall record his own responses, the interviewer noted Mr. Hall's responses on the forms in handwriting. The person interviewing Mr. Hall did not question him about every item listed on the forms, and therefore Mr. Hall did not provide answers concerning the issues which were not discussed. One item in which the interviewer did not discuss with Mr. Hall was an item the government now accuses Mr. Hall of purposefully failing to disclose (i.e. "business net worth"). As with various other items, Mr. Hall did not provide an estimate of his business net worth simply because he was not asked to do so.[2] Moreover, contrary to the government's suggestion of concealment, the "Financial Affidavit" forms on which the Pretrial Services agent took notes are unsigned because Mr. Hall was not given an opportunity to sign the form which designates a place for his signature and the other form does not even seek a signature.

The government's claim that Mr. Hall failed to disclose land he owns in Fayette County, Georgia is misleading and inaccurate. The "Financial Affidavit" completed by the Pretrial Services

---

[1] One form is entitled "Financial Affidavit: Personal Net Worth," and the other form is entitled "Financial Affidavit: Monthly Balance Sheet."

[2] Although listed on the "Financial Affidavit" form, the interviewing Pretrial Services agent also did not question Mr. Hall about other issues such as the following: "Total mortgage money owed to defendant," "loan balances," "judgements," "unpaid gambling debts," and "business liabilities."

agent in Georgia does not seek information about specific properties a defendant may own. Rather, the "Personal Net Worth" form asks simply for a cash value estimate of a defendant's "real estate" (i.e. "land") assets.[3] The information reported on the form by the Pretrial Services agent represents Mr. Hall's estimated market value of any land he personally owned.[4] Because the Fayette County property was included in Mr. Hall's estimate, Mr. Hall did not conceal the existence of this property as the government recklessly contends. In fact, Mr. Hall, through his attorney, advised the court in Georgia of the Fayette County property at his detention hearing on November 20, 2007. At this November 20 hearing, Mr. Hall's attorney stated that Mr. Hall "has some raw land that is in Fayette County." November 20, 2007, Trans. at 18 (hereinafter "Trans."). Mr. Hall's attorney further stated that this land is "worth approximately two hundred fifty thousand dollars, and it's listed in the Pretrial Services report." Id..[5]

Other properties which were purchased by businesses in which Mr. Hall either owns or co-owns, such as the Alabama property discussed in the government's response, were not included in his "personal net worth" estimate because such property is not Mr. Hall's personal land. Mr. Hall's understanding of what to include in his "personal net worth" estimate was reenforced by advice he received from his attorneys. According to one of Mr. Hall's attorneys, he and his law partner were "very explicit" with Mr. Hall when discussing the Pretrial Services interview process. Trans., 16.

---

[3]The term "land" appears on the form in handwriting next to "real estate." Mr. Hall did not insert the term "land" and this was presumably done by a Pretrial Services agent.

[4]Due to significant changes in the real estate market since Mr. Hall's interview, Mr. Hall suspects that the value of land owned by him has seriously diminished.

[5]Considering that the record in this case clearly demonstrates that Mr. Hall disclosed his full ownership interest in the Faytette County property in November of 2007, the government's claim that Mr. Hall is somehow concealing his interest in this property is absurd.

Mr. Hall's attorneys advised him to "[l]isten to the questions that the pretrial officer asks you, and give her the information that relates to your *personal accounts*." Trans, 16-17 (emphasis added). Nevertheless, Mr. Hall did inform the Pretrial Services agent that he has ownership interest in companies and that, through at least one of these companies, he has ownership interest in business property. For instance, Mr. Hall freely disclosed to Pretrial Services that he and Eddie Pressley own a company which "develop[s] real estate properties."[6] Moreover, at his November 20, 2007, detention hearing, Mr. Hall's attorney specifically discusses the Alabama property. Mr. Hall's attorney informs the court that Mr. Hall has an interest "in some real estate that is being developed on the Tennessee River in northern Alabama." Trans., 18-19.

The government's assertions regarding the role of Mr. Hall's cousin, Ron Hall, during the bail process in Georgia are also misleading and incorrect. For example, the government suggests that Ron Hall and Mr. Hall did not share a relationship at the time of Mr. Hall's arrest even though the government was aware that Ron Hall played a critical role in attempting to secure Mr. Hall's release and that Ron Hall was present in court for Mr. Hall's detention hearing in Georgia. Mr. Hall's counsel informed the court in Georgia that, prior to the detention hearing, defense counsel had been negotiating with Justice Department prosecutors in Washington, D.C. possible mutually agreeable terms for Mr. Hall's release. Trans. 19-20. During these discussions, Mr. Hall's attorneys advised the government that Ron Hall was a cousin of Mr. Hall's and that Ron Hall "was willing to pledge his own property" in order to alleviate any flight risk concerns the government may have. Trans., 20. Mr. Hall's attorneys reported that, on the morning of the detention hearing, a Justice Department prosecutor informed Mr. Hall's attorneys that "she was going to be sending [Mr. Hall's

---

[6]The government acknowledges that Mr. Hall made this critical disclosure in its Response.

proposal] to her supervisor."[7] Ron Hall was also present at Mr. Hall's detention hearing and Ron Hall's presence at the hearing was repeatedly brought to the court's attention. Trans. 12 & 21.

The government also claims that neither Ron Hall nor any of the other supportive person discussed in Mr. Hall's Motion to Reconsider Defendant's Detention have shown any willingness to offer bond or post property as a form of security. Once again, the government makes an assertion which is clearly false. As discussed above, Mr. Hall's attorneys informed the government that Ron Hall was willing to post his property in order to secure Mr. Hall's release. Additionally, at the detention hearing, Mr. Hall's attorney advised the court that "Ron Hall is here in court, and is willing to pledge his real estate." Trans. 21.

2. <u>Mr. Hall's ties to the United States</u>

In its Response, the government continues to falsely argue that Mr. Hall's ties to the United States are weak. In making this argument, the government desperately focuses on the few years of Mr. Hall's life when he was living abroad. The government, however, ignores the fact that Mr. Hall was serving the United States military during the entire period in which he lived abroad. Mr. Hall began living abroad only because he was stationed overseas while serving in the United States Army. After his honorable discharge, Mr. Hall returned overseas to assist the United States military.[8] Other

---

[7]Mr. Hall's attorney went on to inform the court about the government's unseemly behavior toward the defense by stating: "Little did we know, that, you know, whatever the litigation tactics were, they were not telling us they were getting an indictment, they were not telling us that they actually were not, real frankly, negotiating with us in good faith, and they were not telling us that they were going to continue on with their claim of detention." The government did not dispute these allegations regarding their tactics and they did not dispute the representations made by Mr. Hall's counsel regarding Ron Hall.

[8]Mr. Hall did this through his employment with Kellogg, Brown and Root (KBR) and as a private contractor.

than this service to the military, Mr. Hall has always lived in the United States.

As the defense has shown repeatedly, Mr. Hall was born and raised in the United States and he is a United States citizen. Mr. Hall received all of his education in the United States and he has worked at various places in the United States.[9] Mr. Hall has served in the Georgia National Guard and the United States Army. As part of his military service, Mr. Hall served in the first Gulf War and earned numerous awards in relation to his service in the war. The government has acknowledged that Mr. Hall owns property in the state of Georgia, that bank records tie Mr. Hall to his residence in Georgia, and that his Georgia residence is the business address for one of his companies. Further, identification documents belonging to Mr. Hall which were confiscated by the government show that Mr. Hall was issued a driver's license by the State of Georgia and his passport contains a Georgia address.[10] Despite such undisputed strong ties to the United States, the government continues to espouse its incredible argument that Mr. Hall somehow is weakly connected to this country.

The government also claims that Mr. Hall lacks any significant family ties in the United States and that any family and friends he has in this country will be unable to exercise moral suasion over him. Mr. Hall's family ties to the United States are strong. Mr. Hall has two sons, a sister, a cousin, aunts, uncles, and other family members and friends who all reside in the United States. Mr.

---

[9] Mr. Hall attended elementary school, middle school, high school and community college in the state of Georgia. Within the United States, Mr. Hall has worked at such places as the Census Bureau, the Bureau of Prisons and a fast food restaurant.

[10] In fact, Mr. Hall was arrested in connection with the instant case near his place of residence in Georgia. Additionally, according to an affidavit in support of a search warrant for Mr. Hall's residence, law enforcement has verified that Mr. Hall does indeed have a residence in the state Georgia.

Hall shares a particularly close relationship with his two sons, his sister and his cousin. Although the government has not disputed the strong relationship shared by Mr. Hall and his sister, the government challenges Mr. Hall's claim that he is close with his children and cousin. The mother of Mr. Hall's first child, Erica Hall, previously submitted a letter to this court discussing the supportive and active role Mr. Hall has played in the life of their child. The government responded by presenting this Court with e-mails between Erica Hall and Mr. Hall which show instances of frustration Ms. Hall has had in the past concerning raising their son while Mr. Hall was overseas. Ms. Hall is aware of the e-mails and continues to support the view that she articulated in her previous letter. Ms. Hall places the prior e-mails in proper context by stating the following:

> Emails submitted in the past due to frustrations, does not reflect the total picture. I acknowledge Terry is not perfect. All relationships have their ups and downs.
>
> When I look at the total picture, Terry has been a good father, overall a great father to his son.

See Exhibit 1.

The mother of Mr. Hall's second child, Marquita Hall, reports that Mr. Hall has "a great relationship with his youngest son Tyree Hall." Exhibit 2. In a letter which is attached to Mr. Hall's Motion to Reconsider Defendant's Detention, Mr. Hall's sister reaffirms that Mr. Hall has a strong relationship with his two children. Mr. Hall's sister states that Mr. Hall "has a bond that is beyond belief with his children" and that "[t]he children really love their father." Mr. Hall's sister also reports that Mr. Hall "spends ample time with each child and I'm a witness that the kids love it."

The support offered by Mr. Hall's cousin, Ron Hall, since Mr. Hall's arrest illustrates the strong bond between Mr. Hall and his cousin. Prior to Mr. Hall's detention hearing in Georgia, Ron Hall was in touch with Mr. Hall's lawyers and he agreed to post his property as security for Mr.

Hall's release. Ron Hall was present in court for Mr. Hall's detention hearing and he was prepared to post his property if so ordered by the court. Ron Hall was also in touch with undersigned counsel shortly after Mr. Hall was transferred to the District of Columbia, and Ron Hall has submitted a letter on Mr. Hall's behalf.[11] If Mr. Hall is released pending trial, Ron Hall is also willing to allow Mr. Hall to stay at his residence.

Throughout this case, several individuals have shown tremendous support for Mr. Hall. These individuals are good working people who will provide Mr. Hall with the proper assistance, advice, and guidance if Mr. Hall were to be released. The government's allegations that Mr. Hall's family and friends lack the ability to exercise moral suasion over him are unfounded.

3. <u>Mr. Hall's Severance of His Oversees Ties and His Permanent Relocation to Georgia</u>

The government continues to misstate Mr. Hall's representations regarding his severance of overseas ties and his permanent relocation to the state of Georgia. The government's entire argument against Mr. Hall rests on its faulty claim that Mr. Hall states that he severed his overseas ties in the Spring of 2007. The government's persistence with its false claim is troubling considering that Mr. Hall has always maintained that he began severing his overseas ties after the Spring of 2007, and Mr. Hall has repeatedly corrected the government's misstatements concerning this issue. As Mr. Hall has stated previously, he relocated back to the United States and was severing his ties overseas in the Summer of 2007. On November 16, 2007, the day after Mr. Hall's arrest, he informed a Pretrial Services representative in Georgia that he began relocating back to the United States in about June of 2007. Mr. Hall advised Pretrial Services that he did not secure a stable residence in Georgia until about August of 2007. In December of 2007, Mr. Hall advised this Court of the following: "A

---

[11]Ron Hall's letter is attached to Mr. Hall's Motion to Reconsider Defendant's Detention.

few months after the seizure of his computer, Mr. Hall traveled abroad for the purposes of winding down his business affairs overseas and finalizing his permanent relocation back to the United States rather than to flee or avoid prosecution." Motion For Defendant's Release, 6. Since Mr. Hall's computer was seized in March of 2007, Mr. Hall was clearly stating as early as December of 2007 that his relocation took place after the Spring of 2007.[12]

Evidence in which the government has discussed regarding Mr. Hall's travel, and activity in foreign bank accounts actually support, rather than weaken, Mr. Hall's prior statements. For instance, the most recent overseas travel the government attributes to Mr. Hall occurred in July of 2007. Travel abroad in July of 2007 is consistent with Mr. Hall's position that he was traveling overseas a few months after March of 2007 and that he did not permanently relocate to the United States until the summer of 2007. What is truly significant about the government's evidence is that they cannot point to overseas travel during the months of August, September, October, and November of 2007. The lack of any such travel during these four months is powerful evidence supporting Mr. Hall's position that he relocated to the United States in the summer of 2007.

The government also discusses foreign bank accounts which it attributes to Mr. Hall and it argues that significant transactions occurred in these accounts as recently as October 1, 2007. Although the extent to which Mr. Hall controlled the accounts referenced in the Government's Memorandum in Opposition to Defendant's Motion to Reconsider Detention is a disputed matter which goes to the underlying offense, the government does admit that other people are responsible

---

[12]In December of 2007, the government's earlier mischaracterization of Mr. Hall's statements sparked Mr. Hall to reply in the following manner: "The government appears to incorrectly assume that Mr. Hall has previously stated that he completed his overseas business dealings in the Spring of 2007. Mr. Hall has never made such a statement."

for some of the activity occurring in the accounts, and that some of the accounts are in the name of other individuals. Nevertheless, whatever involvement Mr. Hall had in the transactions described by the government, such activity is not inconsistent with Mr. Hall's claim that he was winding down his business affairs in the summer of 2007. Obviously, one cannot wind down these types of business affairs overnight and Mr. Hall never stated that financial transactions fully ceased in the summer of 2007. In fact, Mr. Hall previously informed this Court that, as part of the winding down process, there have been transfers of some monies between bank accounts. Mr. Hall also advised that, by December of 2007, any foreign bank accounts connected to him were either closed or contained significantly depleted funds. Considering that the government has not mentioned any evidence of foreign account activity during the remaining thirty days of October 2007 or during any time in November of 2007, the government's evidence strongly supports Mr. Hall's claim that he was discontinuing his business activities abroad.

    4. <u>Mr. Hall's Current Economic Situation</u>

In an effort to correct government misinformation regarding Mr. Hall's current economic condition, Mr. Hall has repeatedly requested the government to present evidence regarding the current status of any accounts attributable to Mr. Hall. To this date, the government has failed to provide any current information to this Court. Because the government continues to rely on information from last year, its portrayal of Mr. Hall is dated and inaccurate.

Recently, Mr. Hall provided this Court with updated information concerning his financial condition. In this update, Mr. Hall indicated that his situation has significantly worsened. Because the government could not dispute any of the updated information provided by Mr. Hall, it chose to mischaracterize Mr. Hall's update as some claim of poverty on his part. While Mr. Hall's economic

resources have declined, and he does not possess the vast amounts of money the government alleges, Mr. Hall is not claiming to be poor. This mischaracterization by the government provides yet another example of its careless distortion of the facts and arguments presented by Mr. Hall.

    5. <u>The Government Makes Several Assertions Which are Very Speculative</u>

Much of the government's Response is dedicated to arguing issues which pertain to the charged offense or making speculative arguments for which the evidence is seriously lacking. Because arguments made by the government about "criminal proceeds" and alleged conduct with "co-conspirators" directly relate to the charged offense, Mr. Hall is not in a position to reply to these claims. However, there is one speculative argument made by the government which warrants some response here. The government argues that Mr. Hall has a "secret fund" which he has not previously disclosed. The government bases its belief on a recorded phone call which allegedly involved Mr. Hall and his sister. The phone call allegedly took place in March 2008 and the government claims that Mr. Hall's sister informed Mr. Hall that their cousin was in possession of "that card," and that the cousin obtained a certain amount from the card. Without offering any further information about "that card" or any specific evidence about what the cousin allegedly obtained from the card, the government recklessly concludes that this discussion involved secret funds. Without more evidence, the government's speculative argument should be disregarded.

    6. <u>The Government Has Mischaracterized Mr. Hall's Legal Arguments Against Detention</u>

By claiming that Mr. Hall argues that pretrial detention on the basis of flight risk can occur only if "the defendant expressly stated that he intended to flee, was making preparations to flee, or had the propensity to flee," the government grossly misrepresents the legal argument put forth by Mr. Hall. <u>See</u> Government's Response, 8. Mr. Hall has clearly stated that the legal principle upon which

he relies to support his position that pretrial detention in this case is unlawful is "[m]ere opportunity for flight is not sufficient grounds for pretrial detention." See United States v. Himler, 797 F.2d 156 (3d Cir. 1986). Significantly, the government has not disputed this legal principle. When discussing the government's failure to show such evidence as any statement by Mr. Hall indicating an intent to flee, preparations made by Mr. Hall for the purpose of fleeing, or that he has the propensity to flee, Mr. Hall is simply highlighting the government's inability to show more than the mere opportunity to flee. Mr. Hall has never suggested that these three examples represent an exhaustive list of what the government must show in order to justify detention in this case. Mr. Hall simply points out that the government has not presented any evidence beyond mere opportunity for flight in its request for pretrial detention.

The government improperly suggests that pretrial detention based on risk of flight is routine. The Bail Reform Act, United States Constitution, and controlling case law clearly do not support the government's contention. The United States Supreme Court has held that

> federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and it serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."

Stack v. Boyle, 342 U.S. 1, 4 (1951). The Supreme Court has also held that the Eighth Amendment "obligates judges passing upon the right to bail to deny such relief only for the strongest of reasons." Sellers v. United States, 89 S.Ct 36, 38 (1968). According to the Court, any "[d]oubts whether [bail] should be granted or denied should always be resolved in favor of the defendant." Herzog v. United States, 75 S.Ct. 349, 351 (1955).

Similarly, the Court of Appeals for the District of Columbia Circuit held that, under the Bail Reform Act, "[d]etention until trial is relatively difficult to impose." United States v. Singleton, 182 F.3d 7, 9 (D.C. Cir. 1999). In a separate case, the Court of Appeals for this Circuit revoked a district court's order detaining a Turkish national based on risk of flight. See United States v. Xulam, 84 F.3d 441 (D.C. Cir. 1996). In this case, the Court of Appeals determined that the defendant's release was required considering that he was employed, had no prior convictions, had no history of failing to appear for court, and had community support. Id.. In Xulam, the Court placed great significance in the fact that the government had seized defendant's passport and travel documents. Xulam at 443. Without these documents, the court concluded, "it is unlikely he could go far even if he wished to." Id.. The Xulam court was also not persuaded by the argument that, if defendant truly wanted to flee, no one could stop him. With regard to this argument, the Court stated the following:

> The magistrate judge and district court referred several times to the notion that if the defendant were to flee, his supervisors could not stop him. That, of course, is true of every defendant released on conditions; it is also not the standard authorized by law for determining whether pretrial detention is appropriate. Section 3142 speaks of conditions that will "reasonably" assure appearance, not guarantee it.

Xulam at 444.

Other Circuits have reversed district court detention orders in cases where evidence of risk of flight was stronger than in the instant case. See United States v. Himler, 797 F.2d 156 (3d Cir. 1986) (pretrial detention unlawful in case even where defendant was unemployed; had prior convictions for offenses involving moral turpitude, including a multiple count conviction for possession of false identification; was on probation; and was wanted in a separate jurisdiction based on unresolved criminal charges); United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007) (reversal of district court's detention order in case involving the prosecution of a very wealthy couple despite

district court's findings that defendants failed to disclose all assets in financial disclosure; defendants continue to fail to satisfactorily explain certain financial transactions; defendants misrepresented nature of their business; defendants maintained relationships with overseas contractors; the evidence against defendants in charged case was strong; and defendants face lengthy prison terms if convicted); and United States v. Friedman, 837 F.2d 48 (2d Cir. 1988) (pretrial detention improper in case involving charges of sending and receiving child pornography even where district court found evidence of defendant's sexual abuse of children; defendant possessed collection of child pornography, defendant was facing serious federal charges; and any community support defendant enjoyed had seriously eroded).

## CONCLUSION

For the reasons discussed in this Reply, and based on the entire record in this matter, Mr. Hall respectfully requests that this Court revoke its order of detention in this case and set the least restrictive conditions of release which will reasonably assure Mr. Hall's appearance in court.

        Respectfully Submitted,

        A.J. KRAMER
        FEDERAL PUBLIC DEFENDER

          /s/
        _____
        TONY W. MILES
        Assistant Federal Public Defender
        625 Indiana Avenue, N.W., #550
        Washington, D.C. 20004
        (202) 208-7500

**EXHIBIT 1**

TO: WHOM IT MAY CONCERN

FROM: ERICA L. HALL

DATE: August 5, 2008

RE: TERRY HALL

    I still maintain my position that Terry is a good father. Emails submitted in the past due to frustrations, does not reflect the total picture. I acknowledge Terry is not perfect. All relationships have their ups and downs.
    When I look at the total picture, Terry has been a good father, overall a great father to his son.


Sincerely Yours,

*Erica L. Hall*
Erica L. Hall

**EXHIBIT 2**

Case 1:07-cr-00318-EGS   Document 27-3   Filed 08/06/2008   Page 1 of 3

August 5, 2008

To Whom This May Concern,

Terry Hall has always maintained a great relationship with his youngest son Tyree Hall. Even though Terry has been overseas working since before the birth of our son, he has always kept in touch and visited. As a matter of a fact, last July 2007, was the closest he has ever been with his son Tyree.
He started to visit him more and he surprised Tyree by bringing his older brother, Terez Hall, to Texas for 5 days. While they were visiting in Texas, Terry and the boys had plenty of Father and Son time. They did fun activities everyday and I know the boys will never forget that week.

Terry often visited Tyree in Texas. When he had business to attend to in Texas, he would always stop by to spend time with his son Tyree. Terry would call and speak with Tyree at least once or twice a week, just to see how things were going. Tyree started playing baseball for the first time in September 2007. Terry would fly in just to attend a baseball game and to tell his son how well he played ball.

Terry Hall has always strived from the beginning of his youngest son's birth, to give his boys the best future ever. He always wanted them to have a better life and to not start from the bottom like he had to. Because of his determination, he has always been an excellent provider for all of his family, especially his boys. He has always worked hard and provided financial stability for the family. Even when Terry couldn't physically be there, I knew he meant well, because he took care of us, even when most black men wouldn't.

Terry would often complain about being a lousy husband and that I deserved better, but I continued to pray for the marriage and wanted so bad for the marriage to work out. Even though the marriage never got better, he never let our marrital problems interfere with his relationship between his son Tyree. I would often complain to Terry about not attending school activities, karate testing, basketball games, birthday parties, life lessons, etc., but I often reminded myself and thanked God for him. If it weren't for him loving his son so much, and Terry financially supporting us, epsecially his son, we wouldn't have as much as we do.

Terry often talked about what he wanted for the boys, things like not worrying about college tuition, food, and having extra spending money. He would sit and tell the boys how he struggled and that he didn't want them going through the same struggles. Even when the boys would get upset because he wasn't physically there, he would explain to them that he worked hard so they could have a better life, participate in activies, and have what they wanted and that they would appreciate and understand later in life.

Terry and I haven't been together for years now, due to separation and divorce. Still to this day, my son will not accept any other man that comes into my life. I know it's because of his relationship with his father. Terry often remind our son that I have to move on with my life, but he refuse to accept anyone other than his father. Although Terry and I have not been together as a couple for some time, my son didn't see the downside of our marriage. He always saw us getting along as a family and he will cherish the concept forever.

Since Terry has been incarcerated, he has continued to call and write his son at least once a week. Terry has not been able to support his son financially, since his incarceration, and it has affected us in so many ways. I know that my son is emotionally suffering because he doesn't understand why his dad isn't here with him. Tyree doesn't understand why those people are making his dad out to be a bad guy when that's not who we know. We have always, always, and continue to teach our son to be honest and do the right thing, because GOD sees everything. My son, now 10, is always on his knees (and putting his dad's name on the Prayer list) praying for his father's freedom and innocence.

Page 1

I end this letter to say that Terry Hall is an awesome man, was an awesome provider and tried to be the best Father he knew to be.

Sincerely,

*Marquita Hall*

Marquita Hall